# IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF MISSOURI
### WESTERN DIVISION

| | | |
|---|---|---|
| JAMES RIVER INSURANCE COMPANY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 4:25-CV-00257-DGK |
| | ) | |
| KC WILLOW CREEK, LLC, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

This is an insurance coverage declaratory judgment action. In the underlying lawsuit, Defendant Denise Henderson ("Henderson") sued Defendants KC Willow Creek, LLC ("KCWC"), and Landmark Reality of Missouri, LLC ("Landmark"), for negligence in the Circuit Court of Jackson County, Missouri. Plaintiff James River Insurance Company ("James River") seeks a declaration that its coverage of KCWC and Landmark's liability in the underlying suit is limited to the $50,000 sublimit under the Assault and Battery Limits of Liability Endorsement ("the Endorsement") to the Commercial General Liability Insurance Policy ("the Policy") James River issued to KCWC. James River also seeks a declaration that payment of the $50,000 sublimit extinguishes James River's obligations to KCWC and Landmark in the underlying suit.

Now before the Court is James River's motion for summary judgment. ECF No. 37. Finding there is no genuine dispute as to any material fact and James River is entitled to judgment as a matter of law, the Court GRANTS the motion. James River's coverage of KCWC and Landmark's liability, if any, in Henderson's underlying suit in Jackson County, Missouri, is limited to the $50,000 sublimit as stated in the Endorsement to the Policy. Payment of the $50,000 sublimit extinguishes James River's obligation to KCWC and Landmark in the underlying suit.

**Summary Judgment Standard**

Summary judgment is appropriate if, viewing all facts in the light most favorable to the nonmoving party, there is no genuine dispute as to any material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). Material facts are those facts "that might affect the outcome of the suit under the governing law," and a genuine dispute over material facts is one "such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party seeking summary judgment bears the burden of showing a lack of a genuine dispute as to any material fact, *Celotex Corp.*, 477 U.S. at 323, and the Court views the facts in the light most favorable to the nonmoving party, drawing all reasonable inferences in that party's favor, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588–89 (1986). But the nonmoving party "cannot simply rest on the allegations in [his] complaint." *Sherman v. Collins*, 158 F.4th 904, 907 (8th Cir. 2025). "Instead, he must substantiate his allegations with sufficient probative evidence [that] would permit a finding in [his] favor on more than mere speculation, conjecture, or fantasy." *Grant v. City of Blytheville, Arkansas*, 841 F.3d 767, 770 (8th Cir. 2016) (alterations in original) (citations omitted).

**Undisputed Material Facts**

The material, undisputed facts are as follows.[1] James River (the insurer) issued the Policy to KCWC (the insured), for coverage effective December 1, 2021, through December 1, 2022. The Policy obligates James River to "pay those sums that the insured becomes legally obligated to

---

[1] The Court has limited the facts to those that are undisputed and *material* to the pending summary judgment motion. *See* Fed. R. Civ. P. 56(c) (emphasis added); L.R. 56.1(a). The Court has excluded legal conclusions, argument presented as fact, proposed facts which are duplicative of other proposed facts, and proposed facts which are not admitted and not properly supported by the record or admissible evidence. *See* Fed. R. Civ. P. 56(c); L.R. 56.1(a). The Court has included proposed material facts which have been improperly controverted. *See* Fed. R. Civ. P. 56(c); L.R. 56.1(a).

2

pay as damages because of bodily injury . . . to which this insurance applies." It grants James River "the right and duty to defend the insured against any suit seeking those damages" and states that James River "will have no duty to defend the insured against any suit seeking damages for bodily injury . . . to which this insurance does not apply." The Policy limits coverage for bodily injury to $1,000,000 per occurrence and $2,000,000 in the aggregate.

The Endorsement provides a sublimit that further limits coverage under the Policy for certain claims involving assault and battery. Specifically, the Endorsement limits coverage to $50,000 per occurrence and $100,000 in aggregate for the insured's liability for

> "bodily injury" . . . arising out of, resulting from, or in connection with:
>
> 1. Assault or battery, whether or not caused or committed by or at the instructions of, or at the direction of or negligence of you, any insured, any person, or any causes whatsoever;
>
> 2. The failure by you, any insured or any person to suppress or prevent an assault or battery;
>
> 3. The failure to provide an environment safe from assault or battery, including but not limited to the failure to provide adequate security, or the failure to warn of the dangers of the environment which could contribute to assault or battery;
>
> 4. The negligent employment, investigation, hiring, supervision, training, or retention of any person;
>
> 5. The use of any force to protect persons or property whether or not the "bodily injury", "property damage" or "personal and advertising injury" was intended from the standpoint of the insured or committed by or at the direction of the insured;
>
> 6. The failure to render or secure medical treatment or care necessitated by any assault or battery.

The Endorsement defines "bodily injury" as "bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time." It defines "assault" as "assault . . . and any threatened harmful or offensive contact between two or more persons, whether or not

3

caused . . . by . . . negligence of You, any insured, any person, or any causes whatsoever." It defines "battery" as "battery . . . and any actual harmful or offensive contact between two or more persons, whether or not caused . . . by . . . negligence of You, any insured, any person, or any causes whatsoever."

The Endorsement declares that its coverage sublimits are "not in addition to the Limits of Insurance shown in the Commercial General Liability Declarations . . ., but specifically limit" those General Liability limits. The Endorsement (like the other Policy endorsements) announces at the top of each page, "THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY." Once James River has paid out the applicable amount under the Endorsement sublimit, its "duty to defend any claim or suit or to pay any settlement or judgment or defense costs ends."

The litigation underlying this insurance coverage case arose from a shooting death at a Kansas City, Missouri, apartment complex owned, operated, and/or controlled by KCWC. On August 7, 2022, Henderson's spouse ("Decedent"), was fatally shot by unidentified, armed assailants ("the Assailants") while he was sitting in his vehicle in the apartment complex parking lot. The Assailants began firing weapons after robbing another apartment resident in one of the apartment complex's parking lots. The Assailants did not intend to strike or harm any particular person. Rather, their gunfire was random, indiscriminate, and/or intended as cover fire following the robbery of the other resident. Decedent was struck by a stray or redirected bullet fired by one of the Assailants during this random, indiscriminate, cover fire. Decedent died of the gunshot wound. It is unknown whether the robbery victim fired a weapon directly at Assailants or to provide cover fire to help the resident leave the place where the robbery occurred. Decedent's injuries and death occurred during the Policy coverage period.

4

At the time Decedent was shot, KCWC did not have security measures—such as sufficient lighting, security phones, panic alarms, video surveillance, properly trained security attendants, and security patrols—in place at the apartment complex to prevent the kind of attack that killed Decedent and protect the safety of others, even though KCWC was aware that the surrounding area was a high crime area. In particular, the area had a history of drug-dealing and gunfire related to illegal activities. Neither did KCWC prevent Assailants from entering the apartment complex, monitor the apartment complex for safety threats, warn Decedent or others of threats Assailants posed to their safety, make use of crime information for the area, or anticipate and prevent the shooting. The lack of security measures made the apartment complex vulnerable to violent crime.

On September 2, 2023, Henderson filed a complaint for damages against KCWC in the Circuit Court of Jackson County, Missouri. On March 5, 2025, Henderson amended the complaint to add Landmark as a defendant.[2] Henderson alleges negligence against KCWC and Landmark for their failure to provide adequate security to prevent the shooting that caused Decedent's death.

James River seeks summary judgment on its claim for a declaration (1) that its coverage for KCWC and Landmark in Henderson's underlying state court case against KCWC and Landmark is limited to the $50,000 sublimit as stated in the Endorsement to the Policy and (2) that payment of the $50,000 sublimit extinguishes James River's obligation to KCWC and Landmark under the Policy.

---

[2] A third defendant, Metro Public Safety & Investigations, LLC, who is also a defendant in the underlying suit, was dismissed from this case on May 20, 2025. ECF No. 9.

**Discussion**

This is a diversity action, and, as the parties agree, Missouri substantive law controls. As such, the Court is "bound by the decisions of the Missouri Supreme Court regarding issues of substantive state law. Decisions by the Missouri Court of Appeals may be used as an indication of how the Missouri Supreme Court may rule, but" they are not binding. *Great Lakes Ins. SE v. Andrews*, 33 F.4th 1005, 1008 (8th Cir. 2022) (citations omitted).

The party asserting coverage under an insurance policy "has the burden to show by substantial evidence that the claim is within the insurance contract's coverage. If an insurance company relies on a policy exclusion[3] to deny coverage, the insurance company bears the burden of proving such exclusion." *Richards v. Bunkhouse Bar & Grill, LLC*, 719 S.W.3d 810, 817 (Mo. Ct. App. 2025) (citations omitted). There is no dispute that a bodily injury occurred at a time and place within the terms of the Policy. Therefore, the only issue is whether James River has satisfied its burden of proving the Endorsement's sublimit applies.

James River argues the Endorsement unambiguously alters the main body of the Policy and that the allegations in Henderson's suit against KCWC and Landmark fall squarely within it. Henderson, KCWC, and Landmark respond the Endorsement does not apply to Decedent's shooting. Henderson argues that, even if it does, the concurrent proximate cause rule applies to Decedent's death to require coverage beyond the Endorsement's sublimit. Henderson also contends that the Policy is ambiguous and should therefore be construed in favor of coverage beyond the Endorsement limit. Finally, KCWC and Landmark argue that the question of James

---

[3] In its argument against the application of the concurrent proximate cause rule to this case, addressed below, James River argues the Endorsement is not an exclusion because it does not exclude—but only limits—coverage for assault-and-battery-related claims. *See* ECF No. 48 at 23. Missouri courts generally treat endorsements that limit coverage as "exclusions" from the main policy. *See, e.g.*, *Richards v. Bunkhouse Bar & Grill, LLC*, 719 S.W.3d 810, 819 (Mo. Ct. App. 2025) (referring to an endorsement that limited coverage for an assault-and-battery-related incident as "an exclusion to coverage"). Accordingly, the Court treats the Endorsement as an "exclusion" for the purposes of this motion.

River's duty to indemnify is not yet ripe. For the sake of clarity, the Court first addresses the issues of ambiguity and the applicability of the Endorsement to the facts of Henderson's claims against KCWC and Landmark. The Court then turns to the concurrent proximate cause argument. Finally, the Court addresses KCWC and Landmark's ripeness argument.

### I. The Policy and Endorsement are unambiguous when read together.

"The interpretation of an insurance policy is a question of law . . . . In construing the terms of an insurance policy, [the Missouri Supreme] Court applies the meaning which would be attached by an ordinary person of average understanding if purchasing insurance, and resolves ambiguities in favor of the insured." *Jones v. Mid-Century Ins. Co.*, 287 S.W.3d 687, 690 (Mo. 2009) (citations omitted). "We read insurance policies as a whole to determine the parties' intent, and give effect to this intent by enforcing the contract as written." *Adams v. Certain Underwriters at Lloyd's of London*, 589 S.W.3d 15, 34 (Mo. Ct. App. 2019). "The terms of an insurance policy are ambiguous if they are duplicitous or difficult to understand." *Scottsdale Ins. Co. v. Olivares*, 614 S.W.3d 65, 71 (Mo. Ct. App. 2020) (citation omitted). "Exclusions [*i.e.*, endorsements] are necessary provisions in insurance policies and are enforceable if they are clear and unambiguous. Exclusionary clauses are construed strictly against the insurer." *Taylor v. Bar Plan Mut. Ins. Co.*, 457 S.W.3d 340, 344 (Mo. 2015) (citations omitted). "The policy of insurance and an endorsement must be read together where there is a dispute as to its meaning, and they should be construed together unless they are in such conflict they cannot be reconciled. If the language of the endorsement and the general provisions of the policy conflict, the endorsement will prevail, and the policy remains in effect as altered by the endorsement." *Abco Tank & Mfg. Co. v. Fed. Ins. Co.*, 550 S.W.2d 193, 198 (Mo. 1977).

7

James River argues the Endorsement unambiguously alters the Policy by setting a coverage limit of $50,000 for claims arising out of assault and battery. It points to *Abco Tank* for the principle that endorsements can alter a main policy. The Endorsement itself explains that its coverage sublimits "are not in addition to the Limits of Insurance" that are spelled out in the main body of the Policy "but specifically limit the Limits of Insurance" in the main Policy. And the Endorsement (like the other Policy endorsements) announces at the top of each page, "THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY."

Henderson argues that the Policy's Section III, which sets the Policy's general coverage limits, provides a "complete process for an insured to calculate coverage limits," ECF No. 42 at 39, and does not mention the Endorsement (or any other endorsement). She also argues the Endorsement does not "adjust, delete, or amend the provisions of Section III of the policy in any way to reference its purported sublimit." *Id.* at 38. Therefore, "irreconcilable inconsistency and ambiguity in the policy" arise, because "[a]pplying the [Endorsement]'s 'Schedule' and associated language results in a totally contradictory calculation" to the coverage calculation under Section III. *Id.* at 39.

James River is correct. The Endorsement unambiguously alters the Policy and no contradiction arises. First, contrary to Henderson's assertion, Section III does not purport to provide a complete process for an insured to calculate coverage limits." And nothing requires Section III of the Policy to refer to the Endorsement for the Endorsement to have effect. Indeed, as Henderson observes, Section III does not refer to any of the endorsements in the Policy (and neither does any other section of the main body of the Policy). If Section III (or any other section) had to refer to an endorsement for the endorsement to have effect, then roughly two-thirds of the Policy—all the endorsements—would have no effect. *See* ECF No. 1-3 at 22–63. But

endorsements are necessary and enforceable provisions in insurance policies, *Taylor*, 457 S.W.3d at 344, and courts read an insurance policy as a whole to discern and give effect to the parties' intent "by enforcing the contract as written." *Adams*, 589 S.W.3d at 34. Henderson's approach does the opposite.

Additionally, the Endorsement explicitly refers to the "Limits of Insurance" section of the Policy (Section III); "The Limits of Insurance listed in the [Endorsement] SCHEDULE are not in addition to the Limits of Insurance shown in the Commercial General Liability Declarations . . . but specifically limit the Limits of Insurance shown in the Commercial Geneal Liability Declarations . . . ." ECF No. 1-3 at 41. This, with the announcement on the Endorsement, "THIS ENDORSEMENT CHANGES THE POLICY," unambiguously alters the policy and sets the Endorsement as a limit, when it applies, that supersedes the general limit of the Policy announced in Section III. This is how insurance policies with endorsements work. *See Taylor*, 457 S.W.3d at 344 ("Exclusions [*i.e.*, endorsements] are necessary provisions in insurance policies and are enforceable if they are clear and unambiguous."). Finally, even if the Endorsement were in conflict with the main Policy, the Endorsement would "prevail, and the policy [would] remain[] in effect as altered by the endorsement," *Abco Tank*, 550 S.W.2d at 198.[4]

## II. The Endorsement's definitions of assault and battery apply to Henderson's claims against KCWC and Landmark.

"If a term is specifically defined in an insurance policy, courts will normally look to that definition and nowhere else to determine its meaning. However, in order for the contract

---

[4] Henderson relies on *Jones v. Mid-Century Ins. Co.* for the proposition, "where one provision of a policy appears to grant coverage and another to take it away, an ambiguity exists that will be resolved in favor of coverage." 287 S.W.3d at 689. But the facts in *Jones* are distinguishable from this case. In *Jones*, the Missouri Supreme Court found the insurer's interpretation limiting coverage under its policy "would mean that it never actually would be required to pay its insureds the full amount of . . . coverage its policy ostensibly provides." *Id.* That is not the situation here. The Endorsement does not "take away" coverage otherwise provided by the Policy so that James River, like the insurer in *Jones*, would never have to pay full coverage under the general provisions of the Policy. It simply limits coverage in assault-and-battery-related claims, which are not otherwise explicitly covered in the Policy.

definition to necessarily control, the definition itself must be reasonably clear and unambiguous." *Mansion Hills Condo. Ass'n v. Am. Fam. Mut. Ins. Co.*, 62 S.W.3d 633, 638 (Mo. Ct. App. 2001). "When a[n insurance] policy does not define a particular term, courts use the ordinary meaning of the word as set forth in the dictionary." *Doe Run Res. Corp. v. Am. Guarantee & Liab. Ins.*, 531 S.W.3d 508, 512 (Mo. 2017).

James River argues Henderson's negligence claim falls squarely within the Endorsement because the injury alleged in the claim "arises out of, results from, or is in connection with assault and battery," and the Endorsement applies to such a claim by its own terms. Henderson argues the random, indiscriminate, cover fire that caused Decedent's injuries and death is not assault or battery, which require intent, so the Endorsement does not apply. Henderson also argues that battery requires "contact," which, she argues, requires "physical touching or immediate proximity," neither of which are alleged in her complaint.

James River is correct, and Henderson's arguments are unavailing. The Endorsement defines "assault" and "battery" as simply "assault" and "battery," indicating that the ordinary, dictionary meanings of the terms apply. The Endorsement then goes on to add that "assault" is "any threatened harmful or offensive contact between two or more persons, whether or not caused . . . by . . . negligence of You, any insured, [or] any person . . . .," and "battery" is "any actual harmful or offensive contact between two or more persons, whether or not caused . . . by . . . negligence of You, any insured, [or] any person . . . ." These definitions are reasonably clear, unambiguous, and therefore controlling. *Mansion Hills Condo. Ass'n*, 62 S.W.3d at 638.

The Endorsement's definitions of assault and battery do not require "intent" and explicitly state that negligent—*i.e.*, unintentional—conduct can trigger the Endorsement. This alone undermines Henderson's intent argument, which does not rely on the Endorsement's definitions

10

or ordinary meanings, as required by Missouri law, but rather seeks to import the elements of the legal definitions of assault and battery, *see* ECF No. 42 at 30, even though nothing in the Endorsement indicates the parties intended to do so. Indeed, the inclusion of "negligence" in the assault and battery[5] definitions shows a deliberate choice to include unintentional conduct.

Henderson's argument on the meaning of "contact" also fails. The Policy does not define "contact." Henderson asserts the dictionary meaning of "contact" requires "touching" or "immediate proximity," ECF No. 42 at 30–31 (citing Dictionary.com, https://www.dictionary.com/browse/contact), and because the complaint alleges Decedent was struck by a bullet and not that the shooter touched or spoke with him, no contact—and therefore no battery—occurred. Henderson relies on *Scottsdale* for the proposition (derived from *Adams*) "that not all gunshot wounds arise from an assault and/or battery," *Scottsdale*, 614 S.W.3d at 72, and then concludes that because the Policy does not extend the meaning of "contact" beyond "touching" or "proximity," the gunshot wound to Decedent cannot be a battery.

But *Scottsdale* itself found that "the average layperson [*i.e.*, the person whose understanding determines the ordinary meaning of a term] would reasonably understand the term battery to include a shooting." *Scottsdale*, 614 S.W.3d at 71; *see also id.* at 72 (noting cases where courts found battery in insurance coverage/exclusion forms included shootings). It follows that the average layperson would understand the term "contact" to include a wound made by a bullet. While not every gunshot wound is the result of a battery, a gunshot wound can be a battery and is thus "contact." *See also United States v. Castleman*, 572 U.S. 157, 170 (2014) (noting the "indirect application" of force can constitute battery).

---

[5] The ordinary meaning of "battery," derived from the dictionary, *see Doe Run Res. Corp.*, 531 S.W.3d at 51, also includes negligence: "the unlawful beating of another person including every willful, angry and violent, or negligent unlawful touching of another person's body . . ." *See* "Battery." Merriam-Webster's Unabridged Dictionary, Merriam-Webster, https://unabridged.merriam-webster.com/unabridged/battery (last visited May 29, 2026).

As to assault, Henderson alleges the gunfire that struck and ultimately killed Decedent was "random, indiscriminate, and/or intended as cover fire following the robbery of another resident." ECF No. 1-2 at ¶ 14. Henderson does not define what she means by "cover fire," but the ordinary meaning of "to cover," in the context of violence or combat, means "to guard from attack; . . . guard the safety and further the success of by aggressive action precluding attack." *See Cover*, MERRIAM-WEBSTER'S UNABRIDGED DICTIONARY, https://unabridged.merriam-webster.com/unabridged/cover (last visited May 28, 2026). "Cover fire," then, means gunfire (*i.e.*, "aggressive action") used to guard one's safety and further one's success by precluding the adversary from attacking.[6] Henderson's amended complaint alludes to this ordinary meaning when it alleges, "It is unknown whether the victim of the robbery fired a weapon . . . in an attempt to provide cover fire to enable the resident's safe exit from the place of the robbery." ECF No. 1-2 at ¶ 15. The point of cover fire is to threaten an adversary with gunfire so the adversary won't approach or shoot back. From the Assailants' perspective, the cover fire shielded them as they withdrew from the scene of the robbery. This is assault under the Endorsement's definition of "threatened harmful or offensive contact" (and also, likely, under a legal definition requiring intent, as explained below).

It is also assault under the ordinary meaning of "assault." The ordinary meaning of assault is "a violent attack with physical means (such as blows or weapons); . . . an apparently violent attempt or a willful offer with force or violence to do hurt to another without the actual doing of the hurt threatened." *See Assault*, MERRIAM-WEBSTER'S UNABRIDGED DICTIONARY,

---

[6] *See also Fitzgerald v. Patrick*, No. 88-0499-CV-W-5, 1990 WL 485439, at *6 (W.D. Mo. Feb. 5, 1990), *aff'd*, 927 F.2d 1037 (8th Cir. 1991) ("As defendant Patrick testified, 'the term cover fire would be to fire actually upon someone to cause them to withdraw or to incapacitate them . . . Kill, maim or injure, whatever.'").

https://unabridged.merriam-webster.com/unabridged/assault (last visited May 29, 2026). The purpose of cover fire is to protect oneself or others through the threat or show of violence by firing a gun without necessarily causing the hurt threatened (a gunshot wound). This is the ordinary meaning of assault and therefore satisfies the Endorsement's incorporation of that definition.

Even if a finding of intent were required, the amended complaint alleges intentional assault through its allegation of "cover fire." The amended complaint says the gunfire was "intended as cover fire following the robbery of the other resident." ECF No. 1-2 at ¶ 14. As the Court has explained, the purpose of cover fire is to protect oneself through the threat of harmful contact (a gunshot wound), that is, through assault. To allege the Assailants intended to discharge cover fire is to allege they intended an assault.

And the fact that the shooter did not intend to assault or batter Decedent, *see* ECF No. 42 at 30, does not matter. Missouri courts follow "the common law doctrine of transferred intent[, which] applies to extend an actor's liability for intentional torts like assault and battery by permitting the actor's intent to injure one party to satisfy the intent required to commit an intentional tort against an unintended third party." *McGaugh v. Naudet*, No. WD 87542, 2026 WL 667847, at *15 (Mo. Ct. App. Mar. 10, 2026) (citing Restatement (Third) of Torts section 110(a) (2014)); *see also Fordyce v. Montgomery*, 424 S.W.2d 746, 751 (Mo. App. 1968) ("Of course, if the defendants intended an assault and battery upon Junior but succeeded by mistake in injuring the plaintiff, then they were liable to the plaintiff to the same extent as if he had been their intended victim."). The doctrine of transferred intent also applies to the transfer of intent from assault and battery themselves, so that the intent requirement of battery is satisfied if someone only intends to assault another but then actually makes harmful contact. *See* Restatement (Third) of Torts section 110(b) (2014) ("For purposes of liability for battery, an actor shall be deemed to

13

satisfy the intent required if the actor . . . intends to cause [another] to apprehend that a harmful or offensive contact with his or her person is imminent."). Here, the Assailants intentionally discharged cover fire to make their adversary apprehend imminent harmful contact. That is intentional assault. When their cover fire struck, injured, and killed Decedent, an intentional battery occurred.

### III. The concurrent proximate cause rule does not apply.

Henderson argues that, even if the gunshot that struck and killed Decedent was assault or battery, the concurrent proximate cause rule applies. The concurrent proximate cause rule grants coverage under an insurance policy "where an injury is proximately caused by two events—even if one of those events was subject to an exclusion clause—if the differing allegations are independent and distinct." *Taylor*, 457 S.W.3d at 347.

Henderson argues Decedent's injury and death do not come under the Endorsement because the negligence alleged against KCWC and Landmark is independent of the assault and battery; the assault and battery are "only incidental" to her negligence claim, and "the negligence claim in no way relies on the occurrence of an assault and battery for its success." ECF No. 42 at 32–33 (citing *Adams*, 589 S.W.3d at 33–34); *see also Am. Fam. Mut. Ins. Co. v. Parnell*, 478 S.W.3d 489, 494 (Mo. Ct. App. 2015) (negligence claim not excluded under insurance policy's sexual assault exclusion because sexual assault was "only incidental to the claim"). James River argues the rule does not apply because Henderson's specific negligence allegation is included in the Endorsement's $50,000 coverage limit.

James River is correct. Here, there must be a cause that is covered by the Policy outside the Endorsement for the concurrent proximate cause rule to apply. *See Gateway Hotel*, 275 S.W.3d at 278 ("[A]n insurer is liable for coverage . . . if an insured risk and an excluded risk

constitute concurrent proximate causes of an accident, so long as one of the causes is covered by the policy."). But Henderson has not alleged a cause that is covered by the Policy outside of the Endorsement.

Henderson alleges Decedent's injuries and death were caused by KCWC and Landmark's negligence. She argues they were negligent because, at the time Decedent was shot, KCWC did not have security measures in place at the apartment complex—such as sufficient lighting, security phones, panic alarms, video surveillance, properly trained security attendants, and security patrols—to prevent the kind of attack that killed Decedent and protect the safety of others, even though KCWC was aware that the surrounding area was a high crime area. Neither did KCWC prevent Assailants from entering the apartments, monitor the Apartments for safety threats, warn Decedent or others of threats Assailants posed to their safety, make use of crime information for the area, or anticipate and prevent the shooting.

A negligence claim like this is included in the Endorsement's coverage sublimit. The sublimit applies to bodily injury "arising out of, resulting from, or in connection with assault or battery, whether or not caused . . . by . . . negligence of you [*i.e.*, the insured] . . . ." Moreover, Henderson's allegations come under the various categories listed in the Endorsement, namely, failure to suppress or prevent an assault or battery; failure to provide an environment safe from assault or battery; and negligence in employment, hiring, supervision, or training of any person (*e.g.*, security personnel). When Henderson grants that the Assailants' gunfire was assault and battery, her claim, in the Endorsement's terms, is that Decedent's bodily injuries and death arose out of assault and battery caused by KCWC and Landmark's negligence. This cause of injury is not covered under the Policy apart from the Endorsement, so the concurrent proximate cause rule does not apply. *See Great Lakes*, 33 F.4th at 1010 (holding the concurrent proximate cause rule

15

did not apply to insureds' negligence because the policy excluded assault and battery "caused by or arising out of . . . negligent . . . conduct by the insured"); *Richards*, 719 S.W.3d at 81 ("Generally, where a plaintiff's negligence claim arises out of an assault or battery, the assault or battery exclusion bars coverage of the insured's negligence claim." (citation omitted)); *Adams*, 589 S.W.3d at 27–28 (noting Missouri cases that applied assault and battery exclusions to exclude negligence actions arising out of assault and battery).

It makes no difference if, as Henderson argues, "the risk of harms of the number of theories of negligence advanced by [Henderson] are broad and in no way limited to a risk of assault and battery." ECF No. 42 at 34. The Endorsement unambiguously limits policy coverage for bodily injury "arising out of, resulting from, or in connection with assault or battery, whether or not caused . . . by . . . negligence of you" (i.e., the insured). "So, if an assault [or] battery . . . is excluded, then the policy also excludes negligence that caused the assault [or] battery." *Great Lakes*, 33 F.4th at 1010. The "threshold question" of whether the alleged injury resulted from a covered cause must be addressed under the Missouri Supreme Court's rule for the "independent and distinct" analysis to come into play at all. *Id.* (citing *Taylor*, 457 S.W.3d at 348).[7] Henderson fails to clear this threshold, because the alleged injury to Decedent did not result from a cause covered outside of the Endorsement. On the contrary, the alleged cause—KCWC and Landmark's various negligent acts and omissions—is explicitly included in the Endorsement. Therefore, the concurrent proximate cause rule does not apply.

---

[7] Henderson relies on *Adams* for her concurrent proximate cause argument, but, as the Eighth Circuit explained, "*Adams* is not binding . . . [and] never addresses the threshold question whether the insured's negligence was covered by the policy as it must be for the rule to apply. Instead, it proceeds to analyze whether the negligence claim could be covered as an independent and distinct cause, as though the concurrent-proximate-cause rule could override policy language that would otherwise exclude negligence relating to an assault and battery." *Great Lakes*, 33 F.4th at 1010 (citing *Taylor*, 457 S.W.3d at 348; citation to *Adams* omitted).

**IV. Because the Endorsement applies, James River has no duty to indemnify beyond the Endorsement sublimit as a matter of law.**

Finally, because the Endorsement does apply, any duty to indemnify is extinguished once the Endorsement sublimit is exhausted. "The duty to indemnify is determined by the facts as they are established at trial or as they are finally determined by some other means, for example through summary judgment or settlement." *McCormack Baron Mgmt. Servs., Inc. v. Am. Guarantee & Liab. Ins. Co.*, 989 S.W.2d 168, 173 (Mo. 1999). "Where there is no duty to defend, there is no duty to indemnify." *Am. States Ins. Co. v. Herman C. Kempker Const. Co.*, 71 S.W.3d 232, 236 (Mo. Ct. App. 2002).

The Court has held as a matter of law that the Endorsement applies. Therefore, James River's duty to indemnify under the express terms of the Endorsement does not exceed the Endorsement sublimit. Payment of the $50,000 sublimit extinguishes James River's obligation to KCWC and Landmark in the underlying suit.

### Conclusion

For the reasons set forth above, Plaintiff's Motion for Summary Judgment, ECF No. 37, is GRANTED. James River's coverage of KCWC and Landmark's liability, if any, in Henderson's underlying suit in Jackson County, Missouri, is limited to the $50,000 sublimit as stated in the Endorsement to the Policy. Payment of the $50,000 sublimit extinguishes James River's obligation to KCWC and Landmark in the underlying suit.

**IT IS SO ORDERED.**

Date: July 7, 2026               /s/ Greg Kays
                                 GREG KAYS, JUDGE
                                 UNITED STATES DISTRICT COURT

17